UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (BUFFALO)

| | |
|---|---|
| HUTCH ENTERPRISES, INC., <br><br> **Plaintiff,** <br><br> v. <br><br> THE CINCINNATI INSURANCE COMPANY, <br><br> **Defendant** | **CIVIL ACTION NO**. 1:17-cv-00162-WMC-JJM |

**AFFIDAVIT OF JOHN HUTCHINS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT**

John Hutchins, who, after being personally sworn, states upon his oath the following:

1. My name is John Hutchins and I am over the age of eighteen (18) years and believe in the obligations of an oath. I am, and was at all times throughout this matter, the owner of Hutch Enterprises, Inc., the Plaintiff herein. All of the statements made herein are within my personal knowledge, in my capacity as Plaintiff's owner, and are true and correct to the best of my knowledge, information and belief.

2. Hutch Enterprises, Inc., is the owner of several properties located throughout the State of New York. To protect said properties, Plaintiff purchased a policy of insurance from the Defendant, Policy No. CPP-365-84-72, which covered both real and personal property at issue in this matter (the "Policy"). A list of Plaintiff's properties covered by said Policy appear on page 7 of 140 of Defendant's Exhibit 1.

3. During the winter season that occurred from approximately November, 2014 through March, 2015, several winter storms struck Western New York. Damages from the weight of ice and snow, in addition to "ice damming" resulted in substantial damages to Plaintiff's property located at 6051 S. Transit Road, Lockport, New York ("Property"). Specifically, because of the damage to the Property's roof, the interior of the Property sustained damage to floors, walls and ceiling.

4. The Property sustained substantial roof damages during a storm which occurred on or about November 24, 2014. A claim for damages was submitted to Defendant in connection with that loss ("Hutch I"). Defendant denied said claim in its entirety.

5. Due to Defendant's failure to properly adjust the Hutch I claim, Plaintiff's Property sustained damages to the interior of the building as referenced in paragraph 3 above.

6. Due to the continued damages, Plaintiff's long-term tenant, Carquest, vacated the premises.

7. Following the winter storm, an insurance claim was submitted to Defendant for losses and damages to the properties caused by the ice, snow, ice damming and subsequent water infiltration ("Hutch II").

8. During the time of the both losses (Hutch I and Hutch II), I was recovering from a cancer operation and heart attack. Cincinnati's counsel was aware of the circumstances. In fact, the foregoing was confirmed during the April 29, 2016 EUO,

> Q. What is the relationship between The Insurance Doctor and Hutch Enterprises, Inc.?
> A. They were hired by us as an insurance adjuster to represent us. As you know from the last [EUO], I was out during all of this time in the hospital or recovering, so we needed to have the help of an outside firm.

> Q. When was it that Hutch first retained The Insurance Doctor with respect to the March 2015 claim?
> A. I don't know. I wasn't here because I was recovering from my cancer operation and heart attack.

*See* Exhibit "A" at 10.

> Q. Would you be able to tell me whether that was the only building involved with respect to that claim?
> A. I was home in bed - -
> Q. Is that a no?
> A. - - with a catheter. I couldn't go very far, so no.

*See* Exhibit "A" at 16.

> Q. Was there anything that you handled with respect to the claim prior to handing it over The Insurance Doctor?
> A. No. I was in the hospital.

*See* Exhibit "A" at 26.

9. In the event of a loss, the Policy, *inter alia*, provides the following:

> **a. In the event of "loss" to Covered Property, you must see that the following are done in order to for coverage to apply:**
>
> **…**
>
> **(2) Give us prompt notice of the "loss". …**
>
> **(3) As soon as possible, give us a description of how, when and where the "loss" occurred.**
>
> **…**
>
> **(6) As often as may be reasonably required, permit us to inspect the property proving the "loss" and examine your books and records. …**
>
> **(7) Submit a signed sworn proof of loss…**
>
> **(8) Cooperate with us in the investigation or settlement of the claim. …**
>
> **b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be**

> **reasonably required about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.**

10.     Plaintiff has, in good faith, complied with all of the requirements contained in Section D.3. of the Policy, titled "Duties In The Event of Loss or Damage." Plaintiff notified Defendant of the loss, submitted a proof of loss, permitted Defendant to inspect the property on more than one occasion, and Plaintiff has cooperated to the fullest extent possible. Finally, as required by Section D.3.b. of the Policy, I have, on behalf of Plaintiff, attended and participated in two (2) Examinations Under Oath ("EUO") on August 7, 2015 and April 29, 2016. A full and complete copy of the transcript for the April 29, 2016 is attached as Plaintiff's Exhibit "A."

11.     Although the majority of the April 29, 2016 EUO was focused on the March 5, 2015 loss, it was considered a continuation of the August 7, 2015 EUO. In fact, at the outset of the April 29, 2016 EUO, Plaintiff's counsel stated "Before we begin … [t]his is a continued EUO … I'm just going to ask if you would do the courtesy of only asking questions that he has not already been deposed about." Defendant's counsel agreed and stated "That makes sense. I don't plan on asking the same questions over…."

12.     Contrary to Defendant's allegations, I **did not** refuse to answer any of Defendant's questions during the EUO. Specifically, I **did not** "repeatedly [decline] to provide substantive answers by deferring to the alleged knowledge of the pertinent facts held by the public adjuster he had retained, The Insurance Doctor." I answered all of Defendant's questions, to the best of my knowledge, information and belief. In good faith, I provided the name of the entity who I believed would have information regarding each respective question posed by Defendant. For

example, with respect to contact persons for The Insurance Doctor, I refer the Court to page 8 of

Exhibit "A," which *inter alia*, reads as follows:

> Q.   Do you know the names of anybody from The Insurance Doctor that might have handled this claim?
> A.   Steve Schultz, Vince LaBracco. …

See also page 15 of Exhibit "A," which provides:

> Q.   If we wanted to find out more information from The Insurance Doctor as to the claims submitted to the insurance company, who from The Insurance Doctor would be best to provide that information.
> A.   … Start with their office and ask. The CEO, I believe his name is Vish Patel.

With respect to contact persons for Hutch Enterprises, Inc., I refer the Court to page 10 of Exhibit "A," which *inter alia* provides the following:

> Q.   … Who from Hutch would have contacted The Insurance Doctor?
> A.   Ken Pawlukovich.
> …
> Q.   And from what I recall, he is no longer with Hutch; is that correct?
> A.   He is retired.
> Q.   And what was Ken's role with respect to Hutch?
> A.   He was the vice-president of Hutch Enterprises.

See also pages 28-29 of Exhibit "A," which *inter alia*, provides as follows:

> Q.   When would The Insurance Doctor have gotten involved, is that after or before the agent?
> A.   … Again, I wasn't here. … I don't even know exactly how The Insurance Doctor people were introduced to us. But Ken Pawlukovich, the guy I was telling you about before, would have probably contacted them. …

See also, page 43 of Exhibit "A,"

> Q.   Who from Hutch would they have contacted if they needed those documents?
> A.   … I wasn't here. But probably Ken or our office person, which would have been Carry Ann, …
> Q.   And is Carry Ann still with the company?
> A.   No.

With respect to inspections and damages to the property, I refer the Court to pages 31-32 of Exhibit "A," which *inter alia*, provide as follows:

> Q. … If there was any damage sustained to the property …, who first would have noticed that damage?
> A. The tenant.
> Q. That is Carquest?
> A. Yes.
> Q. Is there a particular person in charge of that company in and about March of 2015?
> A. I don't know who that would be.
> Q. Is there someone who you dealt with from Carquest?
> A. I didn't deal with anybody at Carquest.  They have an office in Raleigh, North Carolina that we communicated with on issues.
> Q. Was there a particular person at the main office that you dealt with on behalf of Carquest?
> A. No.  It's a different person every time.

See also page 36 of Exhibit "A,"

> Q. Prior to March 5th, 2015 was there anybody on behalf of Hutch that would regularly inspect the property at 6051 Transit Road?
> A. On behalf of my company?
> Q. Yes.
> A. No.  They were triple net leases.
> Q. Can you clarify why - -
> A. A triple net lease means that the tenant is in charge of maintenance.
> Q. Is it your understanding that prior to March of 2015 the tenants would have regularly inspected the property or maintained it?
> A. Yes.

13. The foregoing excerpts are only some of the instances which evidence that I did not decline to provide substantive answers by deferring to The Insurance Doctors.  I certify that I answered all questions truthfully and to the best of my abilities.

14. Plaintiff never refused to permit Defendant and/or its representatives to inspect the property.  In fact, Defendant and its representatives inspected Plaintiff's properties (in connection with Hutch I and Hutch II), on several occasions.  See Defendant's expert report from

RJR Engineering, P.C.  *See* Defendant's Exhibit 7a.  A review of said report discloses that Defendant's agents and Defendant's expert inspected the properties on at least two occasions, February 20, 2015 and March 26, 2015 (see page 3 of the report).  In addition, in Cincinnati's denial letter dated May 26, 2015, Mr. Kompf confirmed that an "inspection of the property was completed on May 19th, 2015… ."  *See* Exhibit "B."

15. At the undersigned's EUO, Defendant was already in possession of the estimate provide to Defendant on behalf of Plaintiff as well as photographs of the property.  *See* Exhibits 1 and 2A-2L from Plaintiff's April 29, 2016 EUO (incorrectly identified as April 29, 2017).  During the April 29, 2016 EUO, Defendant's attorney not only confirmed being in possession of the foregoing documents, but actually referred to them throughout the EUO.

> MS. SHAH:   Let's mark a couple of exhibits, 1 and 2 one is the estimate.
> (Whereupon, an Estimate from The Insurance Doctor was marked as Exhibit 1 for identification as of this date by the Reporter.)
> (Whereupon, 22 Pages of Color Copies of Photographs were marked as Exhibit 2 for identification as of this date by the Reporter.)
> Q. Mr. Hutchins, I will show you what has been marked with today's date as Exhibit 1.  It is an estimate with the letterhead The Insurance Doctor on top, …
>
> *See* Exhibit "A" at 16-17.

16. Defendant's letter dated August 24, 2015 pertained to a different claim (#2369476 - Hutch I) for a different date of loss (11/25/2014).  *See* page 31 of 49 of Defendant's Exhibit 3.  Although Defendant's letter is not relevant to the underlying claim in this action (#2432908 – Hutch II), it should be noted that upon receipt of Attorney Shah's letter dated August 24, 2015, Defendant was provided with a detailed response to its request for information and documents after the undersigned's EUO.  *See* Vincent LoBracco's email dated August 26, 2015, commencing on page 7 of 13 of Exhibit "C" attached hereto.  A review of said email discloses

that information was provided as to the loss in general and as to each individual property. The email also confirmed that Plaintiff already had "provided [counsel's] office with repair estimates, incurred roof repair invoices and EMS water extractions invoices." The email further requested Defendant's counsel to provide a detailed listing of any documents it needed to determine coverage of the loss. Nevertheless, Defendant simply continued to make generalized requests for information and documents, which it already possessed.

17. Finally, it should be noted that Defendant made a determination to deny Plaintiff's claim <u>prior</u> to alleging non-cooperation. Relying on its expert's report reference above in paragraph 14, Defendant issued a denial of Plaintiff's claim by way of letter dated May 26, 2015. In concluding that it would not afford Plaintiff any coverage, Cincinnati relied solely on its expert's report and stated the following:

> Cincinnati Insurance has retained an engineer from RJR Engineer to determine the exact cause of loss. The inspection of the property was completed on May 19th, 2015 along with Joseph Lowery of RJR Engineering. …
>
> Cincinnati Insurance Company must respectfully deny coverage … due to the above exclusions, specifically exclusion (d) miscellaneous cause of loss for damage to the roofs at all of the listed locations above.
>
> Based on our investigation and review of your policy we are unable to accept coverage to you for this loss. …
>
> *See* Exhibit "B."

18. The instant action was filed due to the Defendant's denial of Plaintiff's claim.

FURTHER AFFIANT SAYETH NOT.

I declare that I have read the foregoing paragraphs and state that they are true and accurate to the best of my knowledge and belief.

Dated: 3/28, 2017

John Hutchins
Hutch Enterprises, Inc.

State of Florida

County of Broward

**John Hutchins**, appeared before me on March 28, 2017, who affirmed under oath the truth of the foregoing.

Notary Public
My Commission Expires:
2-17-20

LUIS A. DEL VALLE
MY COMMISSION # FF 949360
EXPIRES: February 17, 2020
Bonded Thru Notary Public Underwriters